# Rose Collins, Administratrix, Appellee, v. The Metropolitan West Side Elevated Railway Company, Appellant.

## Gen. No. 15,961.

Negligence—*effect of absence of flagman and crossing gates.* The absence of a flagman and of crossing gates is not conclusive upon the question of liability for personal injuries sustained at a crossing; it must likewise appear that the person injured or killed was in the exercise of due care at and immediately prior to the accident.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook county; the Hon. Arthur H. Chetlain, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1909. Reversed with finding of facts. Opinion filed November 15, 1911.

Addison L. Gardner, for appellant; W. W. Gurley, of counsel.

C. S. O'Meara and John P. Ready, for appellee.

Mr. Presiding Justice Baume delivered the opinion of the court.

This is a suit by appellee against appellant to recover damages for wrongfully causing the death of appellee's intestate, Minnie Ludwig. A trial by jury in the Superior Court resulted in a verdict and judgment against appellant for $2,500.

The declaration contains seven counts, in each of which it is alleged that on October 15, 1907, appellant operated and controlled a certain elevated railroad in the city of Chicago, running east and west to and from said city over 48th avenue in said city, whence said railroad descends to the surface of the ground and thus continues to and past Central avenue in said city, and that the deceased at the time in question was in the exercise of due care for her own safety. The first count avers, in general terms, the negligent operation by appellant of the east-bound train by which the deceased was struck and killed, and of the approach of which she was unaware. The second count alleges the negligent driving by appellant of one of its east-bound trains to and over the crossing of Central avenue at a high and dangerous rate of speed while a west-bound train was pulling out of said crossing after discharging passengers, by reason of which the deceased, who had alighted from said west-bound train and was walking over said crossing, was struck by said east-bound train. The third count alleges negligence of appel-

lant in failing to provide said crossing with gates, guards or a watchman. The fourth count is substantially the same as the third, and alleges, in addition, that an out-going west-bound train obstructs a view at said crossing of an incoming east-bound train. The fifth count alleges substantially the same facts as are alleged in the second and third counts. The sixth count alleges a failure to ring a bell or blow a whistle or sound a gong, or give some warning of the approach of said east-bound train. The seventh count alleges the violation by appellant of a city ordinance requiring a flagman to be provided at each street intersection of any railroad tracks along which cars are operated upon rails laid upon the surface of the ground.

Central avenue runs north and south and is intersected by appellant's railroad at right angles. Two parallel tracks of appellant cross the avenue at grade, the south track being used for east-bound trains and the north track for west-bound trains. The trains are operated by electrical power communicated by a third rail. The station platform for east-bound trains is located east of the avenue and south of the south track, and the station platform for west-bound trains is located west of the avenue and north of the north track. At the time in question the main platform for the west-bound trains was about three feet high, seven feet nine inches wide, and thirteen feet nine inches long, which platform at its east end was connected by three or four steps with a board walk eight feet wide and sixty-six feet long, extending to and connecting with the sidewalk which ran north and south on the west side of the avenue. At this point the avenue was about seventy feet in width. At the west end of the main platform was a railing five feet high, constructed of 2x4 timbers, and above the railing was the station sign painted upon a board 8 to 10 inches in width. In the avenue south of the south track a pole was set, upon which, at a height of ten or twelve feet from the ground, was fas-

tened a twelve inch alarm gong beneath five incandescent hooded lamps.   When in proper working order, the gong was sounded and the lamps were lighted automatically, as an east-bound train reached a point 800 or 900 feet west of the avenue, and so continued until the rear end of said train passed a point about 30 feet east of the avenue.   No flagman was stationed at the crossing, and the crossing was not equipped with gates or guards.   Beginning at a point about 600 feet west of the avenue, the tracks curve to the north.

Early in the forenoon of October 15, 1907, the deceased became a passenger on one of appellant's trains consisting of a single car, for the purpose of going to the home of her sister, Mrs. Collins, who resided on South Park avenue, one block west and six blocks north of the Central avenue station.   When the car arrived and stopped at said station, the deceased, who was the only passenger for that destination, walked from the car onto the main platform and thence proceeded east down the steps and upon the board walk leading to the sidewalk on the west side of the avenue.   The car proceeded west immediately after the deceased went upon the platform and while she was walking down the steps.   When the deceased reached the sidewalk on the west side of the avenue, she appeared to hesitate a moment or two, then turned to her right and walked south to the center or between the rails of the north or west-bound track, then stepping over the south rail of said track, she proceeded in a southeasterly direction, toward the station platform for east-bound trains, to a point near the center of the avenue within one or two feet of the north rail of the south or east-bound track, where she was struck by an east-bound train and killed.   It will be noticed that the deceased, in walking in a southeasterly direction from the west side of the avenue, after alighting from the train, was going in an opposite direction from the home of her sister.   There is some evidence tending to show it was

raining at the time, and it is suggested that the deceased intended to seek shelter in the covered shed located on the east-bound station platform.

Four witnesses, called on behalf of appellee, testified that they saw the deceased at, or immediately before, or immediately after the time she was struck.

Michael Kurtz testified that as he was going south on Central avenue, driving a team hitched to an empty coal wagon, he happened to look up and saw the car strike the deceased, or saw the deceased immediately after she was struck, and while she was off her feet; that she was thrown about 30 feet; that he did not hear any whistle blown or gong sounded; that at the time he saw the deceased he was about a block north of the crossing; that at the time he looked up "it seemed as though something was buzzing in my ear;" that the east-bound car which struck the deceased stopped about 125 feet east of the east-bound station platform. Caroline Fenton testified that while she was in the back parlor of her home looking out of a window, expecting a visit from her mother-in-law, she saw the deceased get out of the car and run east down the steps as if in a hurry; that when she observed the lady she saw get off the car was not her mother-in-law, she turned halfway from the window and then turned back, and just that instant the deceased ran right in front of the east-bound car, and was thrown across the tracks; that at the time she was struck, the car the deceased got off of had just left the station; that the east-bound car was going very fast when it struck the deceased; that she did not hear any bell or whistle or any warning at the time the deceased was struck. On cross-examination the witness testified that she did not see the car hit the deceased, but that she saw the car run over the deceased; that when the deceased turned to go south from the station platform, the east-bound and west-bound cars were directly parallel, so that she could not see one car from the other.

Howard R. Fenton, a lad 14 years of age at the time of the trial in July, 1909, and a son of the preceding witness, testified that he was on the back porch at the time the deceased was killed; that he saw the deceased step off the train and walk southeast in the direction of the platform for east-bound trains; that the deceased had not gone very far when the east-bound train struck her, and she went up in the air and came down in front of the train which went over her; that he heard no whistle or gong, except the whistle of an Aurora and Elgin train which was away behind the train which struck the deceased; that the latter train was coming at a pretty good rate of speed; that the train from which the deceased alighted had started to go west when she had gone down the steps to the lower platform; that when he first noticed the east-bound train, it was passing the west-bound train at a point directly opposite the station platform for west-bound trains.

Josephine Lintz testified that as she was looking out of a window on the second floor of the Fenton house, she saw the west-bound car arrive and stop, and saw the deceased get off; that she then looked away for a minute or two, and when she looked back again the car was not in sight and she saw the deceased lying on the track; that she did not hear any whistle blowing or gong sounding and the bell was not ringing; that when she first saw the east-bound car, it was almost, but not quite, at the same place that the car going west was.

Annie Lindeman, a witness called by appellant, testified that she was a passenger on the east-bound car which struck the deceased, and that she heard one or more whistles before the accident and before the car stopped. Charles H. Marsh, employed by appellant as an electrician and signal repairer, testified that he inspected the crossing alarm gong and lights every day including the day of the accident, and that they

were then in proper working order; that the gong when sounding could be heard the distance of a block. Joseph Moffett testified that, as he was going to the Central avenue station to take a train, he heard a whistle and saw the deceased going from the station toward the avenue; that she stood there and then walked across the tracks, and when she reached the center of the tracks, she stood there and the train hit her.

Harry Richer, the conductor on the east-bound train, testified that, as the train approached Central avenue, he was standing on the rear platform; that when the train had reached a point 200 or 300 yards west of the avenue, he saw the deceased leave the station platform and walk east; that the motorman was sounding the whistle in a succession of blasts; that when the deceased saw the car coming, and after the whistle was sounded, she stopped and seemed to hesitate.

William Wood, the motorman on the east-bound train, testified that when about 600 feet west of the avenue he noticed the deceased get off the west-bound train and immediately walk east; that when about 500 feet west of the avenue he gave the regular crossing whistle, and when about 150 feet west of the avenue he saw the deceased turn south; that he then sounded short whistles as an alarm, and the deceased turned towards him and started to walk east on the west-bound track; that when he got up about in line with her she made a quick move and jumped over foul of the east-bound track, so that the corner of the car struck her and knocked her down; that the third rail, which communicated the power, did not extend across the avenue, and the car traveled across of its own momentum; that when he first saw the deceased the train was running at a speed of 25 miles an hour, which was reduced to 12 miles an hour at a point 150 feet west of the avenue, and then increased a little so as to clear the crossing; that the crossing bell was ringing as the train approached the crossing, and when the deceased

was struck; that when the train stopped its rear end was about 10 feet east of the point where the body of the deceased lay.

As bearing upon the question of due care on the part of the deceased for her own safety, it is argued by appellee that her view of the east-bound train was obstructed; *first,* by the curve around which the train came; *second,* by the outgoing west-bound train from which she had alighted; and *third,* by the railing on the west end of the station platform and the sign board thereon. It may be conceded that the train, from which the deceased alighted, while standing at the station platform, would obstruct her view of a train running east on the south track, but the uncontradicted evidence discloses that the west-bound train left the station platform while the deceased was going down the steps, and that thereafter she walked a distance of more than 100 feet east and south without looking to the west, and until immediately before she was struck by the east-bound train. When the deceased descended the steps from the main platform, she had an unobstructed view to the south of the east-bound track a distance of at least 100 feet west of the crossing, and as the west-bound train proceeded west and the deceased walked east her view of that track to the west continually enlarged, until she reached the center of the west-bound track, when she had an unobstructed view to the west a distance of at least 600 feet, or to the point where the tracks curved to the north. The railing at the west end of the platform could not have obstructed the view of the deceased, because she did not look to the west while she was on the platform, and when she left the platform the railing ceased to be a factor worthy of any consideration.

A clear preponderance of the evidence, entitled to the greater probative force, tends to show that the gong at the crossing was sounding and that the whistle on the east-bound train was blown repeatedly at and

immediately before the time the deceased was struck. It is also clearly established that the deceased had abundant opportunity to observe the east-bound train as it approached the crossing, and that if she had exercised any degree of care whatever for her own safety she would have escaped unhurt. It is not conclusive of the liability of appellant, as seems to be insisted by appellee, that appellant was guilty of negligence in failing to have a flagman stationed at the crossing, or in failing to have the crossing equipped with gates or guards. Notwithstanding the negligence of appellant, appellee cannot recover, unless it appears that her intestate was in the exercise of due care for her own safety at and immediately prior to the time she was struck and killed.

Whether viewed as a question of law or of fact, we are compelled to the conclusion that appellee's intestate was guilty of such contributory negligence as precludes a recovery in this case.

The judgment of the Superior Court is reversed, with a finding of fact to be incorporated in the judgment of this court, that the death of appellee's intestate was caused by her failure to exercise ordinary care for her own safety.

*Judgment reversed with a finding of fact.*